# TAB 1

LEXSEE 35 CAL.APP. 4TH 620

**KENDRA RYAN CAMP et al., Plaintiffs and Appellants, v. JEFFER, MANGELS, BUTLER & MARMARO, Defendant and Respondent.**

**No. B079386.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION ONE**

*35 Cal. App. 4th 620; 41 Cal. Rptr. 2d 329; 1995 Cal. App. LEXIS 497; 10 I.E.R. Cas. (BNA) 1147; 95 Cal. Daily Op. Service 4066; 95 Daily Journal DAR 7143*

**May 31, 1995, Decided**

**SUBSEQUENT HISTORY:**    **[\*\*\*1]**  As Modified on Denial of Rehearing June 29, 1995, Reported at: *1995 Cal. App. LEXIS 603.* Review Denied August 17, 1995, Reported at: *1995 Cal. LEXIS 5077.*

**PRIOR HISTORY:**    Superior Court of Los Angeles County, No. SC016259, James F. Nelson, Judge, *

    \*   Retired judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.

**DISPOSITION:**    The judgment and the order are affirmed.

**COUNSEL:** Nikki Tolt for Plaintiffs and Appellants.

Baker & Jacobson and Robert P. Baker for Defendant and Respondent.

**JUDGES:** Opinion by Masterson, J., with Spencer, P. J., and Ortega, J., concurring.

**OPINION BY:** MASTERSON, J.

**OPINION**

**[\*625]  [\*\*331]  MASTERSON, J.**

Plaintiffs appeal from a summary judgment disposing of their claims against defendant employer for wrongful termination of employment. They also seek reversal of an order compelling them to return certain documents to defendant. We affirm the judgment and the order.

**[\*626] BACKGROUND**

In 1983, plaintiffs Kendra and Ronald Camp, husband and wife, were indicted on several counts in the United States District Court for the Northern District of Oklahoma. **[\*\*\*2]** [1] Count 1, a felony, charged the **[\*\*332]** Camps with conspiracy to use false information for the purpose of defrauding a federally insured bank, and count 4 alleged that they falsely represented to a federally insured bank that they were medical doctors for the purpose of obtaining a loan. In 1984, the Camps entered guilty pleas to those two counts. On count 1, they were sentenced to 13 months' imprisonment; on count 4, they were placed on proba-

35 Cal. App. 4th 620, *; 41 Cal. Rptr. 2d 329, **;
1995 Cal. App. LEXIS 497, ***; 10 I.E.R. Cas. (BNA) 1147

tion for 4 years, to commence upon release from prison. The Camps served approximately one year in prison before commencing probation. They violated the terms of probation, and the court sentenced them to additional prison time. The Camps were eventually released in 1987.

> 1  Because this case comes to us on appeal from a summary judgment, we strictly construe the evidence offered by the moving party below (i.e., defendant) and liberally construe the evidence submitted by the opposing parties (i.e., plaintiffs). (See *Wagner v. Glendale Adventist Medical Center (1989) 216 Cal. App. 3d 1379, 1385 [265 Cal. Rptr. 412].*)

[***3]  In or about September 1989, defendant Jeffer, Mangels, Butler & Marmaro (Jeffer Mangels) hired Mr. Camp on a temporary basis as a legal secretary. A month later, the firm offered him a permanent position, which he accepted. In July 1990, Mrs. Camp was hired by Jeffer Mangels, initially as a temporary legal secretary. She accepted an offer of permanent employment a month later.

The Camps each completed a job application that asked, among other things, if they had ever been convicted of a felony. They answered "no" to that question. [2] The Camps also submitted resumes that omitted any reference to their felony convictions and incarceration. [3]

> 2  The Camps claim they did not believe they had been "convicted" of a felony because the charges against them were resolved through a plea bargain and because an attorney had advised them that their "convictions" were unconstitutional.

> 3  Aside from those omissions, Jeffer Mangels contends that the Camps' resumes contained affirmative misrepresentations. More specifically, for the pe-

riods while the Camps were incarcerated, the resumes falsely indicated that they were employed as legal secretaries. Further, Mr. Camp claimed in his resume that he had attended a school in Oklahoma City, Oklahoma, while a resume to a different employer stated that the school was located in Tulsa. Finally, according to Mrs. Camp's resume, she received an MBA from a school called "Southwestern" located somewhere on the east coast. A private investigator retained by Jeffer Mangels was unable to find any such school.

[***4]  Beginning in 1990, Jeffer Mangels became a contractor for the Resolution Trust Corporation (RTC). The RTC is an agency of the federal government, with responsibility for the sale and liquidation of savings and loan associations placed in receivership or conservatorship on or after January 1, 1989. [*627] As a condition of representing the RTC, Jeffer Mangels was required to certify periodically that none of its employees had ever been convicted of a felony. To comply with this certification process, the firm began asking new, permanent employees in 1990 to sign a form stating that they had not been convicted of a felony. [4] The form stated in part: "Jeffer, Mangels, Butler & Marmaro is a contractor for the Resolution Trust Corporation (RTC), an agency of the United States government. The Firm's contract with the RTC imposes certain fitness and integrity standards on all persons employed by the firm. Therefore, your truthful and appropriate completion of this form is a condition of employment with Jeffer, Mangels, Butler & Marmaro." Mrs. Camp completed and signed the form, stating under penalty of perjury that she had not been convicted of a felony.

> 4  Mr. Camp apparently did not sign the RTC form, presumably because he was hired in 1989.

35 Cal. App. 4th 620, *; 41 Cal. Rptr. 2d 329, **;
1995 Cal. App. LEXIS 497, ***; 10 I.E.R. Cas. (BNA) 1147

[***5]    Shortly after being hired, the Camps acknowledged in writing that their "employment is at will and can be terminated at any time with or without cause."

From July 1990 through March 1991, Mrs. Camp worked for Ron Goldie, a partner at Jeffer Mangels. In her deposition, Camp testified that Goldie told her that he was engaged in "insider trading," i.e., he was passing one client's confidential financial information to another client. She believed Goldie's conduct involved the possible purchase of stock, and she claims that Goldie was transmitting the client's confidential information without its consent. In Camp's words, Goldie "cautioned [her] very strongly not to reveal to any clients that he was feeding information to other clients." Camp reported Goldie's alleged insider trading to the director of human resources in late 1990 and to a member of the firm's management [**333] committee in February 1991. [5] In late March 1991, she was discharged. Jeffer Mangels told Mrs. Camp that she was being terminated because she had typed a letter for Goldie that contained excessive typographical errors. In her declaration opposing summary judgment, she denied having typed the letter. [***6]

> 5    Jeffer Mangels filed a declaration from Goldie unequivocally denying that he had engaged in insider trading. However, Mrs. Camp submitted sufficient evidence to establish that she *reasonably believed* he had committed such conduct.

Also in late March 1991, Jeffer Mangels discharged Mr. Camp, allegedly for using company time and resources to work on a personal matter. He denied any wrongdoing and claims he was discharged solely because he is married to Mrs. Camp.

In March 1992, the Camps filed the action below alleging four causes of action: (1) breach of an implied-in-fact contract; (2) breach of the covenant [*628] of good faith and fair dealing; (3) wrongful termination in violation of

public policy; and (4) misrepresentation. The first three causes of action were brought by both Camps; the final claim, for misrepresentation, was brought by Mrs. Camp alone.

During discovery, Jeffer Mangels learned that Mrs. Camp had retained copies of certain letters and memoranda between Goldie, on the [***7] one hand, and various clients and other attorneys of Jeffer Mangels, on the other hand. Jeffer Mangels moved the trial court for an order requiring the return of those documents. The court granted the motion.

It was also during the litigation that Jeffer Mangels first learned that the Camps had been convicted of a felony. After obtaining that information, the firm moved for summary judgment on the ground that, under the "after acquired evidence" doctrine, the Camps' claims were barred because they had secured employment through misrepresentations on their resumes and job applications. In the alternative, the motion sought summary adjudication on each cause of action. [6] The trial court granted the motion for summary judgment and also ruled in Jeffer Mangels's favor on the alternative grounds supporting summary adjudication of each claim. The Camps timely appealed from the judgment.

> 6    The motion for summary adjudication reasserted the after-acquired-evidence argument for each cause of action. In addition, Jeffer Mangels argued that the first and second causes of action (breach of implied contract and breach of the covenant of good faith and fair dealing, respectively) were without merit because the Camps were at-will employees. Summary adjudication on the third cause of action (violation of public policy) was also sought on the ground that no public policy had been violated. Finally, Jeffer Mangels argued that the fourth cause of action (misrepresentation) failed because

35 Cal. App. 4th 620, *; 41 Cal. Rptr. 2d 329, **;
1995 Cal. App. LEXIS 497, ***; 10 I.E.R. Cas. (BNA) 1147

Mrs. Camp did not reasonably rely on the alleged misrepresentations.

[***8] DISCUSSION

The Camps contend that the trial court erred in granting summary judgment and in ordering them to return to Jeffer Mangels certain documents that Mrs. Camp removed from the office. We conclude that the Camps' at-will status bars their contract and misrepresentation claims and that the after-acquired-evidence doctrine bars their public policy claims. We further conclude that the trial court properly ordered the return of Jeffer Mangels's documents.

A. *Summary Judgment Motion*

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ( *Code Civ. Proc., § 437c, subd. (c)*.) [*629]

"A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record [***9] that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a [**334] triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed. . . ." ( *Hanooka v. Pivko* (1994) 22 Cal. App. 4th 1553, 1558 [28 Cal. Rptr. 2d 70], citations omitted.)

We independently review the trial court's determinations of law. "We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." ( *Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal. App. 3d 1071, 1083 [258 Cal. Rptr. 721].)

1. *First Cause of Action (Implied-in-fact Contract)*

(1a) The first cause of action alleges that Jeffer Mangels made representations and engaged in conduct which created an implied-in-fact contract requiring good cause for termination. The Camps allege that they were discharged in violation of this implied agreement.

(2) *Labor Code section 2922* provides in part that "[a]n employment, having no specified term, may be terminated at the will of either party." That statute "establishes [***10] a presumption of at-will employment if the parties have made no express oral or written agreement specifying the length of employment or the grounds for termination." ( *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654, 677 [254 Cal. Rptr. 211, 765 P.2d 373].) The at-will presumption may be overcome by evidence that the employer and employee impliedly agreed to termination only for cause. Factors creating such an implied agreement include " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' " ( *Id. at p. 680*, quoting *Pugh v. See's Candies, Inc.* (1981) 116 Cal. App. 3d 311, 327 [171 Cal. Rptr. 917].)

(1b) In moving for summary judgment, Jeffer Mangels submitted the Camps' signed acknowledgment forms on which they agreed that their employment was at will. The Camps' allegation of an *implied* contract [*630] requiring good cause for termination is obviously in conflict with their *express* statements on the acknowledgment forms.

(3) "There cannot be a valid express [***11] contract and an implied contract, each embracing the same subject, but requiring dif-

ferent results." ( *Shapiro v. Wells Fargo Realty Advisors (1984) 152 Cal. App. 3d 467, 482 [199 Cal. Rptr. 613]*, criticized on other grounds in *Foley v. Interactive Data Corp., supra, 47 Cal. 3d at p. 688.*) The express term is controlling even if it is not contained in an integrated employment contract. ( *Gerdlund v. Electronic Dispensers International (1987) 190 Cal. App. 3d 263, 272 [235 Cal. Rptr. 279]* **(1c)** Thus, the Camps' express at-will agreement precluded the existence of an implied contract requiring good cause for termination.

Alternatively, the evidence established as a matter of law that no implied contract existed. In that regard, the Camps did not rely on the factors typically used in proving the existence of an implied-in-fact contract. (See *Foley v. Interactive Data Corp., supra, 47 Cal. 3d at p. 680* [discussing factors].)

Instead, Mrs. Camp merely stated that after she complained about working for Mr. Goldie, Jeffer Mangels attempted to find her another position within the firm. Even assuming that the firm "promised" to place Mrs. Camp elsewhere, such a commitment **[***12]** would not alter the presumed at-will nature of her employment; the alleged promise did not concern the possible grounds for termination or create a legitimate expectation of employment for any particular length of time. [7]

> 7    Actually, Mrs. Camp remained employed for almost a month after she stopped working for Goldie.

**[**335]** Nor was the Camps' at-will status altered by the fact that they switched from temporary to permanent secretarial positions. (See *Foley v. Interactive Data Corp., supra, 47 Cal. 3d at p. 678* ["a contract for permanent employment, for life employment, for so long as the employee chooses, or for other terms indicating permanent employment, is interpreted as a contract for an indefinite period terminable at the will of either party"].)

Finally, it is irrelevant that Mrs. Camp quit her prior employment to accept Jeffer Mangels's job offer. Although a job offer may give rise to a good cause termination standard if it includes assurances of long-term employment, a simple **[***13]** offer, without more, is not sufficient. (Cf. *McLain v. Great American Ins. Companies (1989) 208 Cal. App. 3d 1476, 1487 [256* **[*631]** *Cal. Rptr. 863]* [affirming jury verdict for employee on claim of breach of implied-in-fact contract where employee left prior employment based on "promises of long-term advancement possibilities"].) Were it otherwise, every applicant employed at the time of an offer would be exempt from the at-will rule, a result inconsistent with *Labor Code section 2922.*

Thus, the trial court correctly held that the Camps' first cause of action was meritless as a matter of law.

### 2. Second Cause of Action (Breach of the Covenant of Good Faith and Fair Dealing)

**(4)** In their second cause of action, the Camps contend that Jeffer Mangels breached the covenant of good faith and fair dealing inherent in their alleged implied-in-fact contract. It is well established that " '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " ( *Foley v. Interactive Data Corp., supra, 47 Cal. 3d at p. 684*, quoting *Comunale* **[***14]** *v. Traders & General Ins. Co. (1958) 50 Cal. 2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].*)

Since the trial court properly found that there was no implied-in-fact contract requiring good cause for termination, Jeffer Mangels could not, and did not, breach the covenant of good faith and fair dealing by allegedly discharging the Camps without sufficient cause. "It is apparent that continuous employment is not a 'benefit of the agreement' where the employment relationship is strictly at will. . . . [P]

Simply stated, where the at-will employment relationship is terminated, the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance." ( *Hejmadi v. AMFAC, Inc. (1988) 202 Cal. App. 3d 525, 547 [249 Cal. Rptr. 5]*.)

Accordingly, the trial court properly resolved the second cause of action in favor of Jeffer Mangels.

### 3. *Third Cause of Action (Termination in Violation of Public Policy)*

Mrs. Camp alleges in the third cause of action that she was discharged for notifying Jeffer Mangels's management about Mr. Goldie's alleged insider [*632] trading. [***15] Mr. Camp contends he was terminated solely because he is married to Mrs. Camp. [8]

> [8]   Although Mr. Camp's claim is denominated "wrongful termination in violation of public policy," the complaint suggests he is pursuing a statutory claim for marital status discrimination under the California Fair Employment and Housing Act (the FEHA) ( *Gov. Code, § 12900 et seq.*). For purposes of this appeal, we assume that Mr. Camp is alleging a claim under the FEHA.

#### *After-acquired-evidence Doctrine*

(5) In general, the after-acquired-evidence doctrine shields an employer from liability or limits available relief where, after a termination, the employer learns for the first time about employee wrongdoing that would have led to the discharge in any event. Employee wrongdoing in after-acquiredevidence cases generally falls into one of two categories: (1) misrepresentations on a resume or job application; or (2) posthire, on-the-job misconduct. (6a) In moving for summary judgment, Jeffer Mangels argued that the Camps' misrepresentations [***16] on their resumes and job applications-

-discovered by the firm [**336] during the litigation--barred their claims as a matter of law.

The trial court agreed, relying on federal case law existing at the time. (See, e.g., *Summers v. State Farm Mut. Auto. Ins. Co. (10th Cir. 1988) 864 F.2d 700* [employee's misconduct on the job, discovered after discharge, warranted summary judgment for employer on claims of age and religious discrimination]; *Washington v. Lake County (7th Cir. 1992) 969 F.2d 250* [employee's failure to disclose prior criminal convictions on job application, discovered after termination, entitled employer to summary judgment on race discrimination complaint]; *Mathis v. Boeing Military Airplane Co. (D.Kan. 1989) 719 F. Supp. 991* [employee's failure to disclose on job application that she had been discharged by prior employers and convicted of a felony entitled employer to summary judgment on claims of race and sex discrimination; employer did not learn about application misrepresentations until after discharge].)

While the present case was on appeal, the Court of Appeal decided *Cooper v. Rykoff-Sexton, Inc. (1994) 24 Cal. App. 4th 614 [29 Cal.* [***17] *Rptr. 2d 642]*. There, the employee (Cooper) alleged that his termination violated a statutory prohibition on age discrimination and breached an implied-in-fact contract and the covenant of good faith and fair dealing. During Cooper's deposition, the employer learned he had falsified his job application by (1) failing to disclose that two prior employers had fired him, and (2) misstating his employment history. The employer moved for summary judgment based on this after-acquired evidence. In support of its motion, the employer [*633] submitted the declaration of a company manager stating that Cooper would not have been hired had he accurately filled out the application. The trial court granted summary judgment.

The Court of Appeal reversed, stating: "Neither sound public policy nor the general law of contract dictates that an employee who can show that despite loyal and competent service he was fired without cause, in violation of a term of his employment contract--or because of his age, in violation of statute--nonetheless has forfeited all resulting legal remedies against his employer because of material misrepresentations he made years earlier in his employment application. **[***18]** Although resum fraud is a serious social problem, so is termination of employment in violation of antidiscrimination laws or in breach of contract. . . . Where an employer has fired a worker in violation of a statutory ban on discrimination in the workplace, the purpose and effect of the antidiscrimination statutes are unacceptably undermined by a principle that would allow a fact that played no part in the firing decision to bar any recovery." (*24 Cal. App. 4th at pp. 618-619.*)

The court in *Cooper* left open the possibility that after-acquired evidence might bar recovery in some cases. It commented that many of the decisions granting summary judgment based on job application misrepresentations had "probably reached the correct result on their facts." (*24 Cal. App. 4th at p. 616.*) The court also stated that it was "declin[ing] to adopt a blanket rule that material falsification of an employment application is a complete defense to [an employee's] claim" ( *id. at p. 617*), thus suggesting that after-acquired evidence might limit or bar an employee's claims in some situations. [9]

> 9  While *Cooper* involved causes of action based on contract theories and age discrimination, we deal here with a common law claim of termination in violation of public policy, at least as to Mrs. Camp. (See fn. 8, *ante.*) Because we have already found that the Camps' at-will status barred their contract-based claims, we do not need to address whether after-

acquired evidence could preclude those claims. (Cf. *Schuessler v. Benchmark Marketing and Consulting, Inc. (1993) 243 Neb. 425, 441-442 [500 N.W.2d 529, 541]* [after-acquired evidence may bar all recovery on wrongful discharge claim based on contract because "[b]reach of contract does not give rise to the same concerns or demand the same protections as does an action based on discrimination"]; *Earl v. Saks & Co. (1951) 36 Cal. 2d 602, 610-612 [226 P.2d 340]* [contract induced by fraud is voidable].)

**[***19]** More recently, the United States Supreme Court held in *McKennon v. Nashville Banner Pub. Co. (1995) 513 U.S. 352 [130 L. Ed. 2d 852, 115 S. Ct. 879]* that after-acquired evidence does not shield an employer from liability **[**337]** under the Age Discrimination in Employment Act (the ADEA) (*29 U.S.C. § 621 et seq.*), although it may limit the type and extent of relief available to a prevailing plaintiff. (513 U.S. at p.     [130 L. Ed. 2d at p. 860-864, 115 S. Ct. at pp. 884-886.) **[*634]**

In that case, the employee (McKennon) had worked for the employer for 30 years and was 62 years old when she was discharged. The employer contended that McKennon was terminated as part of a reduction in force necessitated by financial considerations. After McKennon filed suit under the ADEA, the employer discovered that during the last year of her employment, she had removed and copied several confidential documents concerning the company's financial condition. McKennon claimed that she feared the loss of her job, so she copied the documents and took them home for "insurance" and "protection." The district court granted summary judgment to the employer, concluding that the after-acquired **[***20]** evidence of McKennon's misconduct justified her termination. The court of appeals affirmed.

The Supreme Court reversed, explaining: "The ADEA, enacted in 1967 as part of an on-

going congressional effort to eradicate discrimination in the workplace, reflects a societal condemnation of invidious bias in employment decisions. . . . [P] Deterrence is one object of these [antidiscrimination] statutes. Compensation for injuries caused by the prohibited discrimination is another. . . . The private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the ADEA. . . . [P] The objectives of the ADEA are furthered when even a single employee establishes that an employer has discriminated against him or her. The disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important . . . ." (513 U.S. at p.     [130 L. Ed. 2d at pp. 860-861, 115 S. Ct. at pp. 884-885], citations omitted.) [10]

> 10   The court also overruled the line of cases on which Jeffer Mangels and the court below relied. (See 513 U.S. at p. [130 L. Ed. 2d at pp. 859-860, 115 S. Ct. at p. 883].)

[***21] In rejecting the employer's defense, the Supreme Court analyzed the after-acquired evidence of McKennon's wrongdoing under a theory of unclean hands. The court held that McKennon's inequitable conduct did not bar her lawsuit altogether. (513 U.S. at p. [130 L. Ed. 2d at pp. 861-862, 115 S. Ct. at p. 885].) It further concluded, however, that the available remedies were affected: "We have rejected the unclean hands defense 'where a private suit serves important public purposes.' That does not mean, however, the employee's own misconduct is irrelevant to all the remedies otherwise available under the statute. . . . The employee's wrongdoing must be taken into account, we conclude, lest the employer's legitimate concerns be ignored. The ADEA . . . is not a general regulation of the workplace but a law which prohibits discrimination. The statute does not constrain employers from exercising significant other prerogatives and discretions in

the course of hiring, promoting, and discharging of their employees. In determining [*635] appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, . . . but to take due account of the lawful [***22] prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (513 U.S. at p. [130 L. Ed. 2d at pp. 862-863, 115 S. Ct. at p. 886], citations omitted.) [11]

> 11   The court stated that "as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy." (513 U.S. at p. [130 L. Ed. 2d at p. 863, 115 S. Ct. at p. 886].) As to backpay, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." (*Ibid.*)

California courts often look to decisions construing federal antidiscrimination statutes in deciding issues of state employment law. (See, e.g., *Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal. App. 3d 590, 606-608 [262 Cal. Rptr. 842]* [relying on federal case law to determine elements of sexual harassment claim under [***23] state antidiscrimination statute]; *Yurick v. Superior Court (1989) 209 Cal. App. 3d 1116, 1121-1123 [257 Cal. Rptr. 665]* [following federal case law in determining if employee exhausted administrative remedies under state law].) However, we refer to federal decisions only "where appropriate." ( *Page v. Superior Court (1995) 31 Cal. App. 4th 1206, 1215 [**338] [37 Cal. Rptr. 2d 529]* [declining to follow federal decisions in concluding that individual supervisor can be personally liable under state antidiscrimination statute].)

Here, Mrs. Camp's public policy claim [12] and Mr. Camp's marital status discrimination claim [13] allege conduct on the part of Jeffer

Mangels that purportedly violated statutory law. In that regard, the claims are similar to [*636] those in *Cooper* and *McKennon*. On the other hand, the nature of the Camps' misrepresentations and their potential detrimental impact on Jeffer Mangels distinguish this case from prior decisions.

12    To establish a wrongful termination in violation of public policy, an employee must prove that the employer's conduct violated a fundamental, substantial, and well-established policy of the state. ( *Foley v. Interactive Data Corp., supra,* 47 Cal. 3d at p. 670, fn. 11.) The policy at issue must emanate from either a statutory or constitutional provision. ( *Gantt v. Sentry Insurance (1992) 1 Cal. 4th 1083, 1095 [4 Cal. Rptr. 2d 874, 824 P.2d 680].*) We assume, without deciding, that Mrs. Camp's claim is based on a policy of sufficient public importance, i.e., the laws against insider trading. (See *Chadwick v. State Bar (1989) 49 Cal. 3d 103 [260 Cal. Rptr. 538, 776 P.2d 240]* [attorney suspended from practice for insider trading]; *Sullivan v. Massachusetts Mut. Life Ins. Co. (D.Conn. 1992) 802 F. Supp. 716, 723-724* [denying employer's summary judgment motion in part where employee claimed he was discharged for reporting what he reasonably believed to be insider trading].)

[***24]

13    The FEHA makes it unlawful to discriminate against an employee on the basis of "marital status." ( *Gov. Code, § 12940, subd. (a)*.) "Marital status discrimination may be established by showing that an . . . employee has been denied an employment benefit by reason of: [P] . . . [P] (c) The employment or *lack of employment* of an . . . employee's spouse." ( *Cal. Code Regs., tit. 2, § 7292.2,* italics added.) If, as alleged, Mr. Camp was terminated solely because Mrs. Camp

was terminated, then he was arguably "denied an employment benefit" by reason of his spouse's "lack of employment"--an issue we need not decide.

In *Cooper*, the employee's misrepresentations disqualified him from employment based on the employer's internal, self-imposed requirements for the job (e.g., a refusal to hire applicants previously fired by another employer). The same is true for other after-acquired-evidence cases involving falsified job applications. [14] *McKennon*, albeit a case of on-the-job misconduct and not application fraud, also involved an employer's voluntarily adopted policy (i.e., one prohibiting [***25] the removal of confidential documents). While the job requirements and employer policies in all of those cases may have served legitimate business goals, the fact remains that they were self-imposed. Here, in contrast, the Camps misrepresented a job qualification imposed by the federal government, such that they were not *lawfully* qualified for the job. [15]

14    See, e.g., *Washington v. Lake County, supra, 969 F.2d at page 256* (county would have fired jailer had it known of his prior convictions); *Churchman v. Pinkerton's Inc. (D.Kan. 1991) 756 F. Supp. 515, 521* (employer would not have hired plaintiff for security guard position had it known of her prior use of narcotics and discharge for cause); *Mathis v. Boeing Military Airplane Co., supra, 719 F. Supp. 991* (employer would not have hired plaintiff had it known of her felony conviction and employment history).

15    In *Mathis v. Boeing Military Airplane Co., supra, 719 F. Supp. 991,* the name of the employer, Boeing Military Airplane Company, suggests that it may have been subject to government-imposed qualifications on its employees. However, the decision does not refer to

any such requirements, and we therefore consider *Mathis* distinguishable.

**[\*\*\*26]** Jeffer Mangels's contract with the RTC required the firm to certify that none of its employees had ever been convicted of a felony. Federal law provides that "[t]he RTC shall not enter into a contract with any contractor unless the contractor and its related entities meet minimum standards of competence, integrity, fitness, and experience. In addition to presenting evidence . . . of competence and experience, the contractor . . . shall be required to certify to the following items: [P] . . . [P] (12) That the contractor will not employ any individual or subcontractor to perform work on the contract who: [P] (i) Has been convicted of any felony." (12 C.F.R. § 1606.4(a)(12)(i) (1995).)

Further, "[w]henever a contractor receives information indicating that the certification or any information upon which it relied in preparing the certification is incorrect in any material respect, the contractor shall **[\*\*339]** promptly notify the RTC." (12 C.F.R. § 1606.4(b)(3) (1995).) Finally, the RTC "may rescind any contract in its entirety or with respect to a particular assignment if: [P] (1) There is a failure to disclose a material fact to the RTC; [P] . . . **[\*637] [\*\*\*27]** [P] [or] (4) There is any material change in the representations or certifications provided to the RTC under § 1606.4 [concerning employees convicted of a felony]." (*Id.* § 1606.15(a).)

The Camps' misrepresentations about their felony convictions went to the heart of their employment relationship with Jeffer Mangels. Under its contract with the RTC, Jeffer Mangels was obligated to ensure that none of its employees had ever been convicted of a felony. In moving for summary judgment, Jeffer Mangels established that the Camps had in fact been convicted of a felony. [16] Further, the Camps' misrepresentations placed Jeffer Mangels in the risky position of certifying to the federal government--inaccurately--that all of the firm's employees met the RTC's qualifications. The Camps thus put Jeffer Mangels not only in jeopardy of losing its contract with the RTC but also of being accused of making false statements itself. Moreover, given the function of the RTC, the nature of the Camps' past criminal conduct--conspiring to defraud a federally insured bank--magnified the potential adverse consequences to Jeffer Mangels of certifying that none of its employees were convicted felons. **[\*\*\*28]** [17]

16   The evidence also established without contradiction that the Camps would not have been hired had Jeffer Mangels known of their felony convictions. Similarly, had Jeffer Mangels learned of the convictions while the Camps were employed, it would have terminated them immediately. Thus, the misrepresentations were material. (See *McKennon v. Nashville Banner Pub. Co., supra,* 513 U.S. at p. [130 L. Ed. 2d at p. 864, 115 S. Ct. at pp. 886-887] ["Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."].)

17   The Camps present two arguments in an effort to minimize the importance of the RTC certification requirements. We reject both. First, they contend that, to their knowledge, they did not work on any RTC matters. Even if true, that contention does not create a disputed issue of material fact regarding whether the RTC required Jeffer Mangels to certify that *none* of its employees had been convicted of a felony. Assuming arguendo that federal regulations (12 C.F.R. § 1606.4(a)(12)(i) (1995)) did not require such certification, Jeffer Mangels's contract with the RTC did. Second, the

Camps claim that during a social event, they mentioned to Jeffer Mangels's director of human resources that they had had "problems with the law." The focus of this alleged conversation, however, was the nature of the "federal honor camp" where the Camps served time; they noted that the facility was co-ed, that they each had "an apartment with a key to [the] apartment," and that "we had tennis courts, golf courses, that we had dinner together every night, we had a theater, [and] we had McDonald's." This conversation, assuming it took place, did not inform the director of human resources that the Camps had been convicted of a felony. Nor does this evidence create a disputed issue of material fact regarding whether the Camps were qualified for their jobs under the RTC requirements.

[***29] As the Supreme Court recognized in *McKennon*, the use of after-acquired evidence must "take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (513 U.S. at p.     [130 L. Ed. 2d at [*638] p. 863, 115 S. Ct. at p. 886].) We appreciate that the facts in *McKennon* (and the cases it overruled) presented a situation where balancing the equities should permit a finding of employer liability--to reinforce the importance of antidiscrimination laws--while limiting an employee's damages--to take account of an employer's business prerogatives.

However, the equities compel a different result where an employee who is disqualified from employment by government-imposed requirements nevertheless obtains a job by misrepresenting the pertinent qualifications. In such a situation, the employee should have no recourse for an alleged wrongful termination of employment. [18] As stated by another court, "The present case is akin to the hypothetical wherein a company doctor is fired [for im-

proper reasons] and the company, in defending a civil rights action, thereafter [***30] discovers that the discharged employee [**340] was not a 'doctor.' In our view, the masquerading doctor would be entitled to no relief . . . ." ( *Summers v. State Farm Mut. Auto. Ins. Co.*, *supra*, 864 F.2d at p. 708.)

18    Assuming Mr. Camp was hired before Jeffer Mangels became a contractor with the RTC, that circumstance would not alter the result. The evidence established that his felony conviction precluded him from being hired even if the RTC requirements were not then in effect. Moreover, Mr. Camp was employed by Jeffer Mangels when the RTC requirements became applicable (sometime in 1990), such that the government criteria rendered him unqualified for continued employment as of that time.

Like the court in *McKennon*, we look to the doctrine of unclean hands for guidance. (7) That doctrine rests on the maxim that "he who comes into equity must come with clean hands." ( *Ellenburg v. Brockway, Inc. (9th Cir. 1985) 763 F.2d 1091, 1097.*) " 'This maxim is far more than a mere banality. It . [***31] . . closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.' " ( *Burton v. Sosinsky (1988) 203 Cal. App. 3d 562, 573 [250 Cal. Rptr. 33].*) In California, the doctrine of unclean hands may apply to legal as well as equitable claims ( *Fibreboard Paper Products Corp. v. East Bay Union of Machinists (1964) 227 Cal. App. 2d 675, 728-729 [39 Cal. Rptr. 64]*) and to both tort and contract remedies ( *Burton v. Sosinsky*, *supra*, 203 Cal. App. 3d at p. 573; *Blain v. Doctor's Co. (1990) 222 Cal. App. 3d 1048 [272 Cal. Rptr. 250]*). [19]

19    The Camps' causes of action are best described as legal claims seeking tort re-

lief. (See Ballentine's Law Dict. (3d ed. 1969) p. 19, col. 2 [defining "action at law" as "[a]n action, the purpose of which is the recovery of a sum of money or damages"]; *Tameny v. Atlantic Richfield Co. (1980) 27 Cal. 3d 167, 175-176 [164 Cal. Rptr. 839, 610 P.2d 1330]* [claim of wrongful termination in violation of public policy subjects employer to tort liability]; *Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal. 3d 211, 221 [185 Cal. Rptr. 270, 649 P.2d 912]* [tort relief available in action under FEHA].)

**[\*\*\*32]**

Of course, ". . . it is not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which **[\*639]** brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants. Accordingly, relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court." ( *Fibreboard Paper Products Corp. v. East Bay Union of Machinists, supra, 227 Cal. App. 2d at pp. 728-729.*)

**(6b)** In this case, we are satisfied that the Camps' misrepresentations about their felony convictions relate directly to their wrongful termination claims. Since the Camps were not lawfully qualified for their jobs, they cannot be heard to complain that they improperly lost them. Given the nature of the misrepresentations, their potential damage to Jeffer Mangels, and the fact that the Camps were disqualified from employment by means of government requirements, the public policies of the state are adequately **[\*\*\*33]** served by barring the Camps' claims and allowing them, if they so desire, to report Jeffer Mangels's alleged wrongdoing to the appropriate authorities. (See

*Blain v. Doctor's Co., supra, 222 Cal. App. 3d at pp. 1063-1064* [plaintiff's legal malpractice claim barred by his own unclean hands; attorney's alleged misconduct--suborning perjury--can be adequately rectified in professional disciplinary hearings or through criminal prosecution].)

Accordingly, the trial court properly found for Jeffer Mangels on the third cause of action.

### 4. *Fourth Cause of Action (Misrepresentation)*

**(8)** In the last cause of action, Mrs. Camp alleges that Jeffer Mangels falsely told her it would find her another position within the firm (other than working for Mr. Goldie). She contends the firm had no intention of placing her elsewhere. She further alleges that Jeffer Mangels falsely stated at one point that no other positions were available. Mrs. Camp purportedly relied on these statements to her detriment by not seeking employment with a different employer.

**20**By precluding the Camps from any recovery and allowing the proper authorities to remedy Jeffer Mangels's alleged wrongdoing, we promote **[\*\*\*34]** both public policies at issue in this case: (1) the employees' interest in preventing wrongful terminations and (2) the employer's need to comply with government-mandated employment criteria. (Cf. *De Burgh v. De Burgh (1952) 39 Cal. 2d 858, 868 [250 P.2d 598]* [doctrine of unclean hands not applicable if it would harm the public interest].) [21]

> 21  It is difficult to understand how the second alleged misrepresentation--that no positions were available--would cause Mrs. Camp to forgo a job search. Indeed, the complaint alleges that Jeffer Mangels made that misrepresentation to induce her to leave the firm.

**[\*\*341]** To prevail on a claim for misrepresentation, Mrs. Camp must establish that she justifiably relied on the alleged statements. (See

35 Cal. App. 4th 620, *; 41 Cal. Rptr. 2d 329, **;
1995 Cal. App. LEXIS 497, ***; 10 I.E.R. Cas. (BNA) 1147

*Nelson v. Gaunt (1981) 125 Cal. App. 3d 623, 635 [178 Cal. Rptr. 167]*.) Of course, Mrs. Camp was an at-will employee who thus had no reasonable expectation that she **[*640]** would be employed by Jeffer Mangels for any particular length of time. In **[***35]** essence, her misrepresentation claim asserts nothing more than that she interpreted the alleged misrepresentations as a promise of continued employment. However, a promise to find an employee another position does not create a justifiable expectation that the employee will be continuously employed. Such a promise still allows for the possibility--consistent with at-will status--that the employee will be discharged with or without cause after the promise is made. (See fn. 7, *ante*.) Because the alleged misrepresentations did not create a reasonable expectation of employment for any specific period, Mrs. Camp could not justifiably rely on those statements in deciding to forgo seeking employment with another employer. (See *Shapiro v. Wells Fargo Realty Advisors, supra, 152 Cal. App. 3d at p. 482* [employee cannot reasonably rely on promise in conflict with at-will provision].)

The trial court properly adjudicated the fourth cause of action in Jeffer Mangels's favor.

B. *Motion to Return Jeffer Mangels's Documents*

**(9)** The Camps also seek reversal of the trial court's order that they return to Jeffer Mangels documents that Mrs. Camp removed from its office shortly after **[***36]** her termination. The trial court found the documents to be protected by the attorney-client privilege and ordered them to be returned. We review the order for an abuse of discretion. Finding none, we affirm.

The evidence before the trial court on Jeffer Mangels's "motion for return of confidential client documents" indicated that, after her dis-

charge, Mrs. Camp returned to the firm to pick up her personal belongings. When she left the office on that occasion, she took with her certain documents she had been maintaining in a personal file. Most, if not all, of the documents at issue consisted of correspondence or memoranda between Mr. Goldie and the firm's clients or other attorneys. Although the assistant director of human resources, Lisa Gepner, was present when Mrs. Camp removed the file with the documents, the record does not indicate that Gepner knew what was in the file.

While the burden of proof was on Jeffer Mangels to establish that the documents in question were protected by the attorney-client privilege ( *National Steel Products Co. v. Superior Court (1985) 164 Cal. App. 3d 476, 483 [210 Cal. Rptr. 535]*), the burden was on the Camps to establish an exception to the **[***37]** privilege, e.g., the crime/fraud exception ( *Geilim v. Superior Court (1991) 234 Cal. App. 3d 166, 174 [285 Cal. Rptr. 602]*). Based on the evidence, the trial court properly concluded that the documents were protected by the attorney-client privilege. Further, because the Camps did not establish **[*641]** that the documents reflected illegal conduct (i.e., Goldie's alleged insider trading), the crime/fraud exception to the privilege did not apply. Accordingly, the court did not abuse its discretion in ruling that the Camps had to return all the documents (including copies) to Jeffer Mangels.

DISPOSITION

The judgment and the order are affirmed.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied June 29, 1995, and the opinion was modified to read as printed. Appellants' petition for review by the Supreme Court was denied August 17, 1995.

# TAB 2

LEXSEE 84 CAL.APP. 4TH 416

**CHRISTINE CRAIG, Plaintiff and Appellant, v. BROWN & ROOT, INC., et al., Defendants and Respondents.**

**No. B136651.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION ONE**

*84 Cal. App. 4th 416; 100 Cal. Rptr. 2d 818; 2000 Cal. App. LEXIS 819; 16 I.E.R. Cas. (BNA) 1591; 2000 Cal. Daily Op. Service 8651; 2000 Daily Journal DAR 11469*

**October 26, 2000, Decided**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC179031. Richard P. Kalustian, Judge.

**DISPOSITION:** The judgment is affirmed. Brown & Root is entitled to its costs of appeal.

**COUNSEL:** Law Offices of Richard J. Wynne and Richard J. Wynne for Plaintiff and Appellant.

O'Melveny & Myers, Scott H. Dunham and Jeffrey A. Wortman for Defendants and Respondents.

**JUDGES:** Opinion by Vogel (Miriam A.), J., with Spencer, P. J., and Ortega, J., concurring.

**OPINION BY:** MIRIAM A. VOGEL

**OPINION**

[*418] [**819] **VOGEL (MIRIAM A.), J.**

The trial court compelled arbitration of this wrongful termination action, which was then arbitrated and decided in favor of the employer. The employer's petition to confirm the arbitrator's award was granted. The employee appeals, claiming she never agreed to arbitrate and, in the alternative, that the arbitration agreement is unfair, unconscionable and unenforceable. We affirm.

FACTS

A.

In 1981, Christine Craig went to work for a company that was later acquired by Brown & Root, Inc., a construction firm. In 1993, Brown & [*419] Root established a four-step Dispute Resolution Program to resolve "all employee [***2] disputes." In a memorandum sent to all employees, Brown & Root explained the purpose of the Dispute Resolution Program and emphasized (in the following form) that everyone would be bound by it:

The enclosed brochure explains the procedures as well as show the Dispute Resolution Program works as a whole. Please take the time to read the material. IT APPLIES TO YOU. It will govern all future legal

disputes between you and the Company that are related in any way to your employment.

The "enclosed brochure" explained the Program's four-step progression--from open access to management, to an informal conference, to mediation, to arbitration. "Arbitration" IS EXPLAINED THIS WAY: "Arbitration is a process in which a dispute is presented to a neutral third party, the arbitrator, for a final and binding decision. The arbitrator makes this decision after both sides present their arguments at the arbitration hearing. There is no jury. If you win, you can be awarded anything you might seek through a court of law. [P] The neutral party, AAA, runs the proceedings which are held privately. Since 1926, AAA has handled hundreds of thousands of cases. Though arbitration is much less formal **[***3]** than a court trial, it is an orderly proceeding, governed by rules of procedure and legal standards of conduct."

**[**820]** The brochure explains the procedure for requesting arbitration, and makes it clear that the maximum cost to the employee is $ 50. The "role of lawyers" in the arbitration process is described in refreshingly candid language: "The Company has access to legal advice through its law department and outside lawyers. You may consult with a lawyer or any other adviser of your choice. Upon approval of the Program Administrator, Brown & Root will pay the major part of your legal fees through the Legal Consultation Plan, up to a maximum of $ 2,500. . . . [P] You are not required, however, to hire a lawyer to participate in arbitration. If you choose not to bring a lawyer to arbitration, the Company will also participate without a lawyer."

B.

In April 1997, Brown & Root terminated Craig's employment. In October, Craig sued

Brown & Root and Daniel Banks (Craig's immediate supervisor), alleging a variety of tort and contract theories (wrongful termination, sexual harassment, gender discrimination, and so on). Banks answered, alleging an agreement to arbitrate as **[***4]** an affirmative defense; Brown & Root filed a petition to compel arbitration supported by declarations and other evidence **[*420]** establishing the facts summarized above. In addition, Brown & Root's evidence showed that, in May 1993 and again in the fall of 1994, copies of the memorandum and the Dispute Resolution Program brochure had been sent to Craig's home address (and that this mail had not been returned to Brown & Root).

Craig (who was and is represented by counsel) opposed the petition, claiming "[t]here exists no evidence that [she] expressly agreed to arbitrate her claims, signed an acknowledgment of receipt of any the [sic] materials constitution [sic] the Program prior to the time her claims arose, or had actual knowledge of the Program . . . ." Her declaration says this about the items mailed to her: "I have carefully read [the memorandum and brochure] and can affirmatively state that I did not receive any of these documents at my residence in Baldwin Park during the years 1993 or 1994."

The trial court granted Brown & Root's petition and dismissed Craig's action with prejudice. Craig appealed, contending the action should have been stayed pending **[***5]** conclusion of the arbitration. Brown & Root conceded the point and we reversed the order of dismissal. (*Craig v. Brown & Root, Inc.* (June 22, 1999, B124425) [nonpub. opn.].) The dispute was thereafter arbitrated and decided in favor of Brown & Root, after which the trial court confirmed the arbitration award. Craig appeals.

DISCUSSION

I.

Craig contends the evidence is insufficient to prove the existence of an agreement to arbitrate. She is wrong.

**(1)** General principles of contract law determine whether the parties have entered a binding agreement to arbitrate. ( *Chan v. Drexel Burnham Lambert, Inc. (1986) 178 Cal. App. 3d 632, 640-641 [223 Cal. Rptr. 838].*) This means that a party's acceptance of an agreement to arbitrate may be express (e.g., *Mago v. Shearson Lehman Hutton Inc. (9th Cir. 1992) 956 F.2d 932* [agreement to arbitrate included in job application]; *Nghiem v. NEC Electronic, Inc. (9th Cir. 1994) 25 F.3d 1437* [agreement to [***6] arbitrate included in handbook executed by employee]; *Lagatree v. Luce, Forward, Hamilton & Scripps (1999) 74 Cal. App. 4th 1105 [88 Cal. Rptr. 2d 664]* [employer may terminate employee who refuses to sign agreement to arbitrate]) or implied-in-fact where, as here, the employee's continued employment constitutes her acceptance of an agreement proposed by her employer ( *Asmus v. Pacific Bell (2000) 23 Cal. 4th 1, 11 [96 Cal. Rptr. 2d 179, 999 P.2d 71]* [implied acceptance [**821] of changed rules regarding job security]; *DiGiacinto v. Ameriko-Omserv Corp. (1997) 59 Cal. App. 4th 629, 635 [69 Cal. Rptr. 2d 300]* [implied acceptance of changed compensation rules]).

**[*421]   (2a)** Brown & Root's evidence shows that copies of its memorandum and brochure were twice sent to Craig, once in 1993, then again in 1994. This evidence created a presumption that Craig received the items that were sent, and shifted the burden of producing evidence to her. (*Evid. Code, § 641* [a letter correctly addressed and properly [***7] mailed is presumed to have been received in the ordinary course of mail]; 1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, §§ 67, 78, pp. 216, 219.) [1] As is true of most presumptions affecting the burden of producing evidence, this one is an expression of common experience, one in which the

presumed fact (receipt of that which was mailed) is so likely to be true that the law requires it to be assumed in the absence of contrary evidence. (Witkin, Cal. Evidence, *supra*, § 54, p. 203.)

---

1   All section references are to the Evidence Code.

---

**(3)** When the foundational facts are established, a presumption affecting the burden of producing evidence obligates the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced to support a finding of its nonexistence--in which event the trier of fact determines the existence or nonexistence of the fact from the evidence [***8] and without regard to the presumption. (§ 604.) Although the presumption disappears where, as here, it is met with contradictory evidence, inferences may nevertheless be drawn from the same circumstances that gave rise to the presumption in the first place. (*Ibid.* ["Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate"]; but see *Bonzer v. City of Huntington Park (1993) 20 Cal. App. 4th 1474, 1481 [25 Cal. Rptr. 2d 278].*)

On this appeal, the disappearance of the presumption is moot. Its only relevance was in the trial court, where the trier of fact (in this context, the court) was required to determine the contested fact (whether the memorandum and brochure were received by Craig) without regard to the presumption and solely on the basis of the conflicting evidence--Brown & Root's declarations and documents showing that the items were mailed to Craig at her home address and not returned, and Craig's equivocal denial of receipt. The trial court decided that issue in favor of Brown & Root, and its credibility call is binding on this appeal. ( *Estate of Joslyn (1995) 38 Cal. App. 4th 1428, 1434 [45 Cal. Rptr. 2d 616].*) [***9]

**(2b)** The disappearance of the presumption does *not* mean there is insufficient evidence to

support the trial court's finding. Brown & Root's declarations and documents (mailing lists) are circumstantial evidence from which the court was entitled to infer that Craig had received the memorandum and brochure. " '[I]f a party proves that a letter was mailed, the trier of fact is required to find that the letter was received in the absence of any [*422] believable contrary evidence. However, if the adverse party denies receipt, the presumption is gone from the case. *The trier of fact must then weigh the denial of receipt against the inference of receipt arising from proof of mailing and decide whether or not the letter was received.*' " ( *Slater v. Kehoe (1974) 38 Cal. App. 3d 819, 832, fn. 12 [113 Cal. Rptr. 790]*, italics added.)

Accordingly, there is substantial evidence (1) that the memorandum and brochure were received by Craig in 1993 and again in 1994; (2) that she continued to work for Brown & Root until 1997; and (3) that she thereby agreed to be bound by [***10] the terms of the Dispute Resolution Program, including its provision for binding arbitration.

[**822] II.

(4) Craig contends the arbitration agreement is in any event an unenforceable adhesion contract. We disagree.

In *Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal. 4th 83 [99 Cal. Rptr. 2d 745, 6 P.3d 669]*, our Supreme Court held that mandatory employment arbitration agreements are enforceable if the arbitration permits the employees to vindicate their statutory rights; that is, "the arbitration must meet certain minimum requirements, including neutrality of the arbitrator, the provision of adequate discovery, a written decision that will permit a limited form of judicial review, and limitations on the costs of arbitration." ( *Id. at p. 91*.) Craig does not contend

that Brown & Root's arbitration procedure fails to meet these requirements. [2] We don't see how she could.

> 2   Although *Armendariz* was decided before Craig's reply brief was due, Craig did not file a reply brief.

[***11]   Brown & Root's arbitration program provides for a neutral arbitrator. ( *Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal. 4th at p. 103* [the neutral arbitrator requirement is essential to ensuring the integrity of the arbitration process].) The cost to the employee is a mere $ 50, substantially less than the filing fee for a superior court action. The balance is paid by Brown & Root. ( *Id. at pp. 107-113*.) Those employees who choose to have a lawyer involved in the process can receive up to $ 2,500 from Brown & Root for that purpose. Adequate discovery is available. ( *Id. at pp. 104-106* [the employer, by agreeing to arbitrate, has by implication consented to permit adequate discovery when the employee asserts a statutory discrimination claim].) All remedies (punitive damages, attorney's fees, injunctive relief, and so on) that would be available in court are available in the arbitration ("If you win, you can be awarded anything you might seek [*423] through a court of law"). ( *Id. at pp. 103-104*.) The arbitrator is required to issue a written award that is subject to judicial review. ( [***12] *Id. at pp. 106-107*.) All claims must be arbitrated. ( *Id. at p. 120*.)

Brown & Root's arbitration program satisfies *Armendariz*.

DISPOSITION

The judgment is affirmed. Brown & Root is entitled to its costs of appeal.

Spencer, P. J., and Ortega, J., concurred.

# TAB 3

LEXSEE 59 CAL.APP.4TH 629

## VICTOR DiGIACINTO, Plaintiff and Respondent, v. AMERIKO-OMSERV CORPORATION, Defendant and Appellant.

### No. B114523.

## COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION SEVEN

*59 Cal. App. 4th 629; 69 Cal. Rptr. 2d 300; 1997 Cal. App. LEXIS 966;
13 I.E.R. Cas. (BNA) 877; 97 Cal. Daily Op. Service 8897; 97 Daily
Journal DAR 14367*

### November 25, 1997, Decided

**PRIOR HISTORY:** [**1] Appeal from a judgment of the Municipal Court for the Pasadena Judicial District of Los Angeles County. Super. Ct. No. BV21376. Mun. Ct. No. 96C00206. Thomas William Stoever, Judge. *

> *    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

**DISPOSITION:** The judgment of the municipal court is reversed and on remand the court is directed to enter judgment in favor of Ameriko-Omserv. Ameriko-Omserv is entitled to costs on appeal.

**COUNSEL:** Herbert A. Moss for Defendant and Appellant.

Nkwo N. Cheaney for Plaintiff and Respondent.

**JUDGES:** Opinion by Lillie, P. J., with Woods and Neal, JJ., concurring.

**OPINION BY:** LILLIE

**OPINION**

### [*631] LILLIE, P. J.

Defendant (hereinafter referred to as Ameriko-Omserv) appeals from a judgment of the municipal court [1] awarding plaintiff $ 19,820.40 in damages on his claim for breach of his employment contract as an at-will employee, after Ameriko-Omserv reduced plaintiff's rate of pay. The issue on appeal is whether the employer of an at-will employee is liable for breach of contract when the employer notifies the employee of a prospective change in his rate of compensation [**2] and thereafter the employee continues in employment. This appears to be an issue of first impression under California law.

> 1    Ameriko-Omserv filed a timely notice of appeal from the municipal court judgment. The appellate department of the superior court, in a unanimous "opinion and judgment" certified for publication and filed on July 8, 1997, reversed the municipal court judgment and re-

59 Cal. App. 4th 629, *; 69 Cal. Rptr. 2d 300;
1997 Cal. App. LEXIS 966, **; 13 I.E.R. Cas. (BNA) 877

manded with directions to enter judgment in favor of Ameriko-Omserv on the ground that as a matter of law, the old contract was negated and a new contract was created through (1) notice to the plaintiff that his wages would be lowered and (2) by his continued service under the lower wages. The opinion and judgment became final on July 23, 1997. On August 14, 1997, we filed order transferring cause on court's own motion pursuant to *California Rules of Court, rule 62(a)*, stating that transfer of the cause to this court is necessary in order to secure uniformity of decision and to settle important questions of law. General standards of appellate review apply to appeals from municipal courts transferred for decision to the Courts of Appeal. ( *Brown v. West Covina Toyota (1994) 26 Cal. App. 4th 555, 557, fn. 1 [32 Cal. Rptr. 2d 85].*)

[**3] FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Victor DiGiacinto filed a complaint in the municipal court against his employer, Ameriko-Omserv, for breach of contract, claiming that the employer, unilaterally and without consideration, modified the specific term for compensation in a written employment contract dated August 22, [*632] 1994, by instituting a second written employment contract dated January 30, 1995, which became effective February 5, 1995.

At trial, the matter was submitted for decision on the trial briefs and agreed facts, which established the following: In June 1990, plaintiff was first hired by Ameriko Inc.; in 1993, Ameriko and Omserv Corporation formed a joint venture named Ameriko-Omserv to provide maintenance services to NASA at Edwards Air Force Base, and the NASA contract was awarded in December 1993. Thereafter, plaintiff was transferred to the Edwards Air

Force Base project and has been employed at that location since that time.

On August 22, 1994, plaintiff signed a letter agreement setting forth the terms and conditions of his employment; the agreement provided for wages at the rate of $ 23.97 per hour for the position of structural/mechanical [**4] supervisor. The agreement also provided that "Length of employment is not guaranteed and may be voluntarily terminated at any time by either party, with or without cause, with or without notice. [P] This letter constitutes the entire understanding between Ameriko-Omserv and you as to the subject matter herein, and supersedes all other existing, prior or contemporaneous agreements, promises, representations, oral or written, between Ameriko-Omserv and you relating to the subject matter herein."

In December 1994, defendant received a letter from NASA suggesting that as a cost-saving measure, plaintiff's position be eliminated. Instead of terminating plaintiff's employment, defendant elected to reorganize his section, reduce his responsibilities, and reduce his wages. On January 30, 1995, plaintiff was notified in writing that his new rate of pay, effective February 5, 1995, would be $ 18.00 per hour. Plaintiff was also orally notified about the reduction in his pay. Plaintiff asked that his wages not be reduced, but defendant told him it was the only way to save his job. Plaintiff continued in defendant's employ after February 5, 1995, although he refused to sign the January 30, [**5] 1995, letter.

In January 1996, almost one year after receiving the reduced wages, plaintiff filed a complaint in the municipal court for breach of contract damages of $ 10,268.40, seeking to recover the $ 5.97 per hour reduction in his rate of pay. He alleged that defendant "unilaterally and without consideration modified the specific terms of the written employment contract dated August 22, 1994, by instituting a second written employment contract dated January 30, 1995 . . . ."

59 Cal. App. 4th 629, *; 69 Cal. Rptr. 2d 300;
1997 Cal. App. LEXIS 966, **; 13 I.E.R. Cas. (BNA) 877

In his trial brief, plaintiff contended that by continuing to work for defendant he "did not expressly or impliedly rescind, repudiate or abandon **[*633]** his claim for damages for breach of the August 1994 contract." He contended that by continuing to work for defendant, he was mitigating his damages. In its trial brief, defendant contended that plaintiff was an at-will employee whose employment was terminated and who was offered a new contract based on lower prospective compensation; plaintiff's continuation in the employer's employ with knowledge of the lower compensation constitutes the acceptance of the new contract and he had waived any right to claim additional compensation. In its statement **[**6]** of decision the municipal court found that plaintiff was an at-will employee and that defendant had good cause to reduce the rate of compensation, but that "The at-will employment contract does not provide for a unilateral compensation reduction--only for termination at will, with or without notice. [P] Defendant could have terminated plaintiff's employment and either re-employed him at the lower rate; or, relegated him to the vast ranks of unemployed aerospace executives. However, defendant took the humane, and what it thought to be legal course of action. The result is indeed a legal irony. Held: Judgment in favor of plaintiff and against defendant in the amount of $ 19,820.40 plus interest . . . ."

Defendant filed a timely notice of appeal. The appellate department of the superior court reversed the trial court, stating in its opinion and judgment that the question of whether the power to terminate at will also includes the power to modify the terms of the employment relationship appears to be one of first impression in California. The superior court adopted the majority approach that "an employer's right to terminate an employee at will necessarily and logically includes what **[**7]** may be viewed as a lesser-included right to insist upon prospective changes in the terms of that employment as a condition of continued employ-ment," and an employee who continues employment after notice of the modification impliedly accepts such modification. The court further reasoned that the majority rule is fair to both the employer and employee: "If the term of the employment is at-will and either party can terminate the agreement at any time for any reason, a change in the compensation rate effectively constitutes a negation of the old contract and becomes an offer of new employment at the new rate. Continued service by the employee constitutes acceptance of the new offer. Consideration is present on both sides; the employee gives up some wage compensation, and the employer gives the employee the opportunity for continued employment. If the employee does not wish to accept the new employment offer, the employee is free to leave the company. Continued service by the employee reasonably implies acceptance by the employee of the new wage amount." The superior court also found plaintiff's mitigation of damages argument without merit: "This argument is unpersuasive and without support **[**8]** in fact. Had appellant simply terminated respondent's employment, respondent **[*634]** would have had no action against appellant. Therefore, there were no damages which respondent could lessen."

After the appellate department's judgment became final on July 23, 1997, we issued an order transferring cause on our own motion on August 14, 1997, pursuant to *California Rules of Court, rule 62(a)*. The parties have filed briefs and oral argument has been had thereon. **(1a)** As stated by appellant, the only issue on appeal is whether DiGiacinto's continued employment with Ameriko-Omserv after being notified of a reduction in wages created a new employment contract between the parties by which DiGiacinto is bound. Although this issue appears to be one of first impression in California, we resolve it consistent with the approach of the majority of courts which have addressed this issue, and consistent with well-established principles of law in California.

DISCUSSION

**(2)** "*Labor Code section 2922* provides: 'An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means employment for a period greater than one **[\*\*9]** month.' . . . The statute creates a presumption of at-will employment which may be overcome 'by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on "good cause." [Citations.]' " ( *Haycock v. Hughes Aircraft Co. (1994) 22 Cal. App. 4th 1473, 1488 [28 Cal. Rptr. 2d 248].*) "The California Supreme Court has held that the presumption of at-will employment exists because of public policy considerations. In *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union (1968) 69 Cal. 2d 713, 727,* footnote 12 . . ., the court held: 'Contracts of employment wherein the only consideration is the services to be performed thereunder and which are silent as to duration, are terminable at will upon reasonable notice *without regard to duration.* [Citations.] Special policy considerations require this result. "[T]he courts have not deemed it to be their function . . . to compel a person to accept or retain another in his [or her] employ, nor to compel any person against [her or] his will to remain in the employ of another. Indeed, **[\*\*10]** they have consistently held that in such a confidential relationship, the privilege [to terminate] is absolute, and [the] presence of ill will or improper motive will not destroy it." [Citation.]' " (*22 Cal. App. 4th at pp. 1488-1489.*)

"There is, of course, a strong common law presumption that an employee may be demoted at will. Since it is presumed that an employee may be discharged at will ( *Lab. Code, § 2922*), the at-will presumption would surely **[\*635]** apply to lesser quantums of discipline as well." ( *Scott v. Pacific Gas & Electric Co. (1995) 11*

*Cal. 4th 454, 464-465 [46 Cal. Rptr. 2d 427, 904 P.2d 834].*) **(3)** Thus, "[i]t is apparent that continuous employment is not a 'benefit of the agreement' where the employment relationship is strictly at will. The 'legitimate expectations' of employee and employer in an at-will employment relationship can be no more than the continuation of employment until one party or the other decides to terminate the relationship. . . . Moreover, the privilege to terminate may be exercised '*without regard to* [*the*] *duration*' of the at-will employment relationship. [Citation.] [P] Simply stated, where the at-will employment **[\*\*11]** relationship is terminated, the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance. To hold otherwise, in our opinion, would constitute an unwarranted judicial intrusion upon the fundamental public policy of this state as expressed in *Labor Code section 2922* and dramatically upset the reasonable expectations of the parties to an at-will agreement of employment." ( *Hejmadi v. AMFAC, Inc. (1988) 202 Cal. App. 3d 525, 547 [249 Cal. Rptr. 5].*)

**(4)** In cases involving employee benefits, such as pension plans and stock options, the rule has developed that the offer of such bonuses constitutes an offer for a unilateral contract, which is accepted if the employee continues in employment after the offer. As explained in *Newberger v. Rifkind (1972) 28 Cal. App. 3d 1070 [104 Cal. Rptr. 663, 57 A.L.R.3d 1232]*, involving stock options, " '[A] bonus is not a gift or gratuity, but a sum paid for services, or upon a consideration or in addition to that which would ordinarily be given.' " ( *Id. at p. 1073.*) "Consideration is inherent where stock options are granted **[\*\*12]** to employees and the employee continues employment knowing of the options . . ., and no additional consideration in money or property is required. . . . [P] Furthermore, in finding consideration for pensions or other benefits, the courts do not distinguish between an inducement to continue em-

ployment and an inducement to begin employment. . . . '. . . Continuing an employment to which one is not bound by contract is as clearly consideration as is entering the employment in the first place.' " ( *Id. at pp. 1073-1074.*) Moreover, "[n]o express, formal request for either a promise or for an act is required for us to find a contract supported by consideration. . . . [P] In the case before us the bargain was implied from the circumstances, and there was an implied request by the optionors that the optionees continue the act of remaining employees in exchange for the granting of the options. No formal bargain or offer was necessary." ( *Id. at pp. 1074-1075*, fn. omitted.) In fact, California "treats this situation as an offer for a unilateral contract." ( *Id. at p. 1074, fn. 4*; see also *Chinn v. China Nat. Aviation Corp. (1955) 138 Cal. App. 2d 98, 100-101 [291 P.2d 91].*) **[**13]

[*636] Although there is no case directly on point in California, there is authority from other jurisdictions that an employer of an at-will employee can unilaterally change the compensation agreement without being in breach of the employment agreement. The underlying principle appears to be that with respect to an at-will employee, the employer can terminate the old contract and make an offer for a unilateral contract under new terms. Thus, the Court of Appeals of Oregon stated in *Albrant v. Sterling Furniture Co. (1987) 85 Or.App.272 [736 P.2d 201]*: "It is well established in Oregon that, without some contrary agreement, an employment contract is terminable at the will of either party. [Citation.] That means that an employer ordinarily may discharge an employee for any reason and at any time. [Citation.] It follows that an employer may also modify the employment contract so long as the modification applies only prospectively. An employee impliedly accepts such modifications by continuing employment after the modification." ( *Id. at p. 203*, fn. omitted; see also *Brett v. City of Eugene (1994) 130 Or.App. 53 [880 P.2d 937, 939].*) The foregoing rule in *Albrant* **[**14] was adopted by the court in *Cotter v.*

*Desert Palace, Inc. (9th Cir. 1989) 880 F.2d 1142, 1145*, applying Nevada law; by the Court of Appeals of New Mexico in *Stieber v. Journal Pub. Co. (1995) 120 N.M. 270 [901 P.2d 201]*; and by the Florida Court of Appeal in *Martin v. Golden Corral Corp. (Fla.Dist.Ct.App. 1992) 601 So.2d 1316, 1317.*

Other courts have reached conclusions consistent with that in *Albrant* but have applied different reasoning. (See *Facelli v. Southeast Marketing Co. (1985) 284 S.C. 449 [327 S.E.2d 338, 339]* [employee held to have impliedly consented to changed compensation rate and was estopped from seeking damages after notice of change]; *Nichols v. Waterfield Financial Corp. (1989) 62 Ohio App.3d 717 [577 N.E.2d 422, 423]* [absent application of equitable doctrines such as detrimental reliance, terms and conditions of at-will contract can be prospectively changed without consideration].)

The Supreme Court of Texas held in *Hathaway v. General Mills, Inc. (Tex. 1986) 711 S.W.2d 227 [69 A.L.R.4th 1139]*, that "Generally, when the employer notifies an [at-will] employee of changes in employment terms, the employee must accept the **[**15] new terms or quit. If the employee continues working with knowledge of the changes, he has accepted the changes as a matter of law." ( *711 S.W.2d at p. 229*; see also *Burlington Northern Railroad Co. v. Akpan (Tex. App. 1996) 943 S.W.2d 48, 50.*)

The *Albrant* line of cases is characterized by the New Mexico court in *Stieber v. Journal Pub. Co., supra, 901 P.2d 201*, as representing the majority rule. "Under this rule, accepted in the majority of jurisdictions that have considered the problem, an employer's right to terminate an employee [*637] at will necessarily and logically includes what may be viewed as a lesser-included right to insist upon prospective changes in the terms of that employment as condition of continued employment." ( *901 P.2d at p. 204.*)

Thus, the majority line of cases supports the proposition that as a matter of law, an at-will employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions. Presumably, under this approach, it would not be legally relevant if the employee also had complained, objected, or expressed disagreement [**16] with the new offer; as long as the employee continued in employment with notice of the new terms, the employee has no action for breach of contract as a matter of law. This is so because the old contract has been expressly or impliedly terminated by the employer's modification. The modification constitutes, in legal effect, both the termination of the old contract and the offer of a new contract. Thus, although the employer may properly discharge the employee altogether under such circumstances, the modification of the terms or conditions of employment also constitutes a new offer to the employee of a unilateral contract.

"A minority approach, exemplified by one case, *Bartinikas v. Clarklift of Chicago N., Inc., 508 F. Supp. 959, 961 (N.D.Ill.1981),* holds that if the employee rejects the proposed modification, then the employer can either discharge the employee or abandon the proposed modification. The *Bartinikas* approach focuses on the proposition that there cannot be an effectively modified contract unless there is both an offer of modification by the employer and an acceptance of that modification by the employee. *Id. at 961.* We find that this focus is overly legalistic [**17] and does not lend itself to practical application. Although the *Bartinikas* case states that its approach is consistent with 'modern notions of fairness in the workplace,' *id.*, we find such statement illogical in light of the court's later concession that the employer can fire any employee who does not accept the proposed modification. *Id.* Thus, the *Bartinikas* approach encourages employers to fire employees, an approach that we hardly believe is in accordance with notions of fairness in the workplace.

Rather, we adopt the majority approach as more enlightened as well as logical." (*Stieber v. Journal Pub. Co., supra, 901 P.2d 201, 204.*)

More recently, the court that produced *Bartinikas* repudiated it. The court in *Schoppert v. CCTC Intern., Inc. (N.D.Ill. 1997) 972 F. Supp. 444* stated it was reluctant to follow *Bartinikas* for several reasons: "First, the cases it cites do not support the proposition that an employer in an at-will relationship cannot impose changes upon its employees as a condition of [*638] continued employment. [*People* ex rel.] *Sterba* [v. *Blaser (1975) 33 Ill.App.3d 1 [337 N.E.2d 410]],* the first case cited, [**18] involves an employment relationship that was not at will. This difference from the present case (and *Bartinikas*) is crucial. As noted by the Seventh Circuit in *Curtis 1000, Inc. v. Suess, 24 F.3d 941 (7th Cir.1994),* the continuation of the employment relation does not constitute consideration for a modification when the employment is not at will, because continued performance on both sides is already a term of the original contract. [Citation.] By contrast, neither party to an at-will relationship has any obligation to perform in the future, and so doing so can provide valuable consideration for a modification of the contract. Because Sterba did not involve at-will employment, it is not applicable here. [P] Nor does Simpson [v. Norwesco, Inc. (8th Cir. 1978) 583 F.2d 1007 [applying Illinois law]] provide strong support. It, too, relies on Sterba. The only other Illinois case Simpson cites for the proposition that an employer may not unilaterally change the terms of employment is Cieslak v. Dahlstrom Mach. Works, Inc., 19 Ill.App.3d 995, 312 N.E.2d 654 (1st Dist.1974), a case on accord and satisfaction, of which only the abstract was published. Both of the cases cited [**19] by Bartinikas are weak support for its sweeping language." (972 F. Supp. at p. 448, fn. omitted.)*

While the court in *Schoppert* did not expressly adopt the rule that an at-will employee who continues to work after notice of modifica-

tion of terms of employment has accepted the modifications *as a matter of law*, the court nevertheless granted summary judgment in favor of the employer as to claims involving certain modifications even though the employee verbally objected to the modifications. The court explained: "Even crediting Schoppert's version that he 'objected continually' to the Modification, as we must on a motion for summary judgment, his actions in continuing to work for over two and a half years, without any demonstration that CCTC might reconsider its ultimatum to him, belie those verbal objections. Schoppert has not indicated that he ever told anyone at CCTC that he would only work under the pre-1991 terms, or that his continued performance was in any way conditioned on the retention of his earlier commission structure. Nor is there any evidence that the 1991 Modification remained open to further negotiation after the December 1991 meeting. In these circumstances, **[**20]** Schoppert's continuing to work for over two and a half years while receiving commissions under the new structure must be seen in legal terms as an acceptance of the 1991 Modification, grudging and protestfilled as that acceptance may have been. The old saw 'actions speak louder than words' has more than a grain of truth to it, and we adhere to it where, as here, a party's words are contradicted by his actions." ( *Schoppert v. CCTC Intern., Inc., supra, 972 F. Supp. at p. 447.*)

**(1b)** With respect to the issue of DiGiacinto's acceptance of the terms of the new contract as set out in Ameriko-Omserv's January 30, 1995, letter, it **[*639]** is not necessary for us here to choose between the approach of the Texas court in *Hathaway* (where continuation of work under the modified terms constitutes acceptance as a matter of law), or the approach of the district court in *Schoppert*. Under either approach to the issue, the evidence in this case is undisputed and permits only the conclusion that DiGiacinto accepted the terms set out in the January 30, 1995, letter. Moreover, the January 30, 1995, letter must be considered to constitute the employer's notice of termination of the old at-will **[**21]** employment contract and an offer of a unilateral contract under new terms. Accordingly, under the undisputed facts of this case, DiGiacinto failed to establish any breach of the August 1994 contract; rather, on January 30, 1995, it was validly terminated by Ameriko-Omserv. The municipal court thus erred in finding in plaintiff's favor.

DISPOSITION

The judgment of the municipal court is reversed and on remand the court is directed to enter judgment in favor of Ameriko-Omserv. Ameriko-Omserv is entitled to costs on appeal.

Woods, J., and Neal, J., concurred.

# TAB 4

LEXSEE 179 CAL.APP.2D 1

**NAOMI GAMA, Appellant, v. COUNTY OF KERN, Respondent**

**Civ. No. 6030**

**Court of Appeal of California, Fourth Appellate District**

*179 Cal. App. 2d 1*; *3 Cal. Rptr. 380*; *1960 Cal. App. LEXIS 2188*

**March 17, 1960**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of Kern County. Gordon L. Howden, Judge.

Action against a county to recover extra pay for night shift work which was allegedly due but unpaid.

**DISPOSITION:** Affirmed. Judgment of dismissal after sustaining demurrer to first amended complaint and plaintiff's failure to file an amended complaint within the time allowed, affirmed.

**COUNSEL:** James Murray and Markuse & Murray for Appellant.

Roy Gargano, County Counsel, and Rex R. Mull, Deputy County Counsel, for Respondent.

**JUDGES:** Shepard, J.   Griffin, P. J., and Coughlin, J., concurred.

**OPINION BY:** SHEPARD

**OPINION**

[*2]   [**381]  This is an appeal from a judgment of dismissal resultant after the court sustained defendant's demurrer to plaintiff's first amended complaint and plaintiff's failure to file an amended complaint within the time allowed to amend.

In the original complaint it is alleged that plaintiff is one of 42 nurses who served on the night shift in the Kern County General Hospital during the period from November 1, 1952, to May 17, 1956; that during that period of time an ordinance of said county provided $ 10 per week extra pay for nurses who served on said night shift; that said nurses [***2] were not paid said extra pay; that each of said nurses filed claims therefor with the board of supervisors as provided by law; that said claims were rejected; that the question to be decided by this action is one of common and general interest to all general duty nurses in said hospital; that each of the other 41 claimant nurses have authorized the action in their behalf; that said 42 nurses suffered an aggregate damage of $ 11,843.  The complaint prays judgment in that sum.  After defendant's demurrer was sustained to this complaint, plaintiff filed her first amended complaint and therein in general substance alleges essentially the same facts, including the filing of claims and the rejection thereof.  But she further alleges in the new complaint that there are no records to establish the amount each nurse should recover; that the amount due each nurse can be proved by a common set of facts; that defendant was required to set up a fund to pay said nurses; that

such fund is in the general fund of the county and is sufficient to make such payments; that each nurse owns a pro rata portion of said funds; that the only means of determining each nurse's exact interest is by finding total [***3] number of night shifts, the total number of nurses working night shifts, and dividing the fund among the nurses on a pro rata basis. She then alleges [*3] unjust enrichment to defendant by reason of nonpayment, and that the defendant has become "a constructive trustee of said nurses" (probably meaning a constructive trustee for said nurses of the alleged common fund). She prays declaration that the defendant is a constructive trustee of the funds; that she be appointed trustee thereof for the nurses she represents; and that she be authorized to ascertain the amounts due each nurse and distribute the fund to them.

The demurrer to this first amended complaint was on the grounds of lack of legal capacity of plaintiff to sue, defect or misjoinder of parties, several causes of action not separately stated, insufficiency of facts stated to constitute a cause of action, and ambiguity and uncertainty as to whether or not the cause of action is equitable or legal in nature.

On September 8, 1958, demurrer was sustained, and plaintiff allowed until October 31, 1958, to amend. November 12, 1958, pursuant to notice, defendant moved to dismiss for failure to amend the complaint within [***4] time, and judgment of dismissal was entered the following day. Plaintiff appeals.

The primary question here presented is whether or not this plaintiff has properly alleged facts to show the existence of a constructive trust so as to give her the right to maintain an action in a representative capacity for all other claimants allegedly having an interest therein. Appellant cites in support of her contention that this is a proper case for a representative action on the constructive trustee theory, [**382] three authorities, i.e., *Fanucchi v. Coberly-West Co., 151 Cal.App.2d 72 [311 P.2d 33]; Weaver v. Pasadena Tournament of Roses, 32 Cal.2d 833 [198 P.2d 514]; and Barber v. California Emp. Stab. Com., 130 Cal.App.2d 7 [278 P.2d 762].* Her complaint follows quite closely the general structure of the pleadings in the Fanucchi case and the intent of the pleader is quite clearly shown by paragraph VII of the first amended complaint, which reads as follows:

"By failing to pay said nurses said night shift differential pursuant to law, as aforesaid, defendant unjustly enriched at the expense of said nurses and it holds said earnings as a constructive [***5] trustee of said nurses."

In her prayer she prays for:

"1. An order of this court declaring defendant to be constructive trustee of said night shift differential payments which, by the terms of said Section 967 are due by law to plaintiff and to those whom she represents.

"2. An order of this court appointing plaintiff trustee of [*4] that amount due by law to plaintiff and those whom she represents, to notify all members of said class of the judgment, to ascertain the pro rata interest of each of said nurses and to distribute to each of said nurses the amount due each by law.

"3. An order of this court requiring defendant to pay to plaintiff, for herself and all those whom she represents, said night shift differential payments owed by law to plaintiff and all others similarly situated."

The Fanucchi case involved a complaint to establish on behalf of several hundred growers a constructive trust in monies derived by the ginning company through an arbitrary short weight scheme through which growers were fraudulently deprived of pay for their cottonseed. There was no record of weights for any individual farmer on the cottonseed and the ginning company was alleged to have thus [***6] made a secret profit through breach of its fiduciary duty as an agent. The Weaver case

179 Cal. App. 2d 1, *; 3 Cal. Rptr. 380, **;
1960 Cal. App. LEXIS 2188, ***

involved the refusal of the Supreme Court to permit a representative action on behalf of certain persons refused tickets to the annual Rose Bowl Game because they lacked community of interest. The Barber case involved a refusal by the appellate court to apply representative actions to unemployment benefit claimants; likewise due to lack of community of interest.

**(1)**   Appellant cites no authority and we have found none authorizing the application of the theory of "unjust enrichment" and "constructive trust" to the general fund of a county on an ordinary debt for alleged unpaid wage items. We have here a simple case of alleged unpaid wages from a county to its employees. Claims therefor were filed with the board of supervisors, and rejected. Apparently plaintiff seeks to avoid, in part at least, the statute of limitations as to some or all of these claims by adopting a theory of the establishment of a constructive trust. There is no suggestion that this is not an action to recover payment for personal services nor that the remedy provided by law is inadequate. Under such conditions equity will not **[\*\*\*7]**   intervene. ( *Smith v. Bliss, 44 Cal.App.2d 171, 177* [6] *[112 P.2d 30]*; *Murdock v. Swanson, 85 Cal.App.2d 380, 384 [193 P.2d 81]*; *Tompkins v. Hoge, 114 Cal.App.2d 257, 264 [250 P.2d 174]*.)

**(2a)**   There is no allegation from which it adequately appears that defendant acquired the funds in question from plaintiff or from a third party for plaintiff by fraud, accident, mistake, violation of trust or other wrongful act, nor that defendant was guilty of any breach of confidential relations. **[\*5]** (*Civ. Code, § 2224*; *Smith v. Bliss, supra, p. 177*.) **(3)** "Constructive trusts" are "fraud rectifying" trusts and not "intent-enforcing" trusts. ( *Johnson v. Clark, 7 Cal.2d 529, 533* [1] [*61 P.2d 767]*.)

**(2b)**   It is clear from the foregoing that no "constructive trust" exists. Defendant demurred on the ground of ambiguity and **[\*\*383]**   uncertainty whether or not plaintiff intended an equitable action or a straight action at law. The demurrer was sustained on all grounds. We think the only cause of action even attempted to be alleged is one for the establishment of a constructive trust which is an equitable action, but even if we could hold that the action **[\*\*\*8]**   might be construed to be an action at law, the very least that could be said on behalf of the complaint would be that it was ambiguous in that respect. Thus the demurrer for ambiguity would have been good in any event and the failure to amend under the conditions set forth would have been fatal and would have authorized a dismissal.

In view of the foregoing, other points raised by appellant need not be discussed.

The judgment is affirmed.

# TAB 5

LEXSEE 124 CAL. APP. 2D 831

**MARY GEDSTAD, Appellant, v. JOE O. ELLICHMAN et al., Respondents**

**Civ. No. 15708**

**Court of Appeal of California, First Appellate District, Division Two**

*124 Cal. App. 2d 831; 269 P.2d 661; 1954 Cal. App. LEXIS 1815*

**April 29, 1954**

**PRIOR HISTORY:**   [***1] APPEAL from a judgment of the Superior Court of Alameda County. A. J. Woolsey, Judge.

Action to void a property settlement agreement and for an accounting of community property.

**DISPOSITION:**   Affirmed. Judgment for defendants affirmed.

**COUNSEL:** Young, Ryan & Whitton and Albert K. Whitton for Appellant.

John L. McVey for Respondents.

**JUDGES:** Nourse, P. J.   Dooling, J., and Kaufman, J., concurred.

**OPINION BY:** NOURSE

**OPINION**

[*832] [**662] Plaintiff, the former wife of defendant Joe Ellichman, sued to void a property settlement agreement signed by the parties in anticipation of a divorce suit and for an accounting of their community property. In the agreement, dated August 13, 1948, she declared to have received complete settlement of all property rights including community prop-

erty and to waive maintenance and support in consideration of $ 1,000 previously paid and $ 1,000 to be paid within six months. Her action was based on alleged fraud and concealment of defendant in inducing her to accept as her share a small portion of the total community property while representing it to be a fair division; two counts relating to mistake in entering into the agreement were added by amendment on [***2] stipulation.

[*833] The court found in substance that the defendant presented the above agreement to the plaintiff at her request, that she signed it with knowledge of the properties owned as community property and of the legal effect of the agreement and without any misrepresentation or concealment on the part of defendant; that defendant did not make representations as to the amount or division of the community property under mistake, and that plaintiff did not rely on these representations under mistake, or was mistaken as to her community rights or the need of independent counsel; that the parties divided their property and that plaintiff received from defendant more than $ 1,800 after the signing of the agreement and had received $ 1,000 prior thereto; that plaintiff at her own choice and volition did not seek independent advice before executing the agreement; that defendant husband secured a decree of divorce

by default in which it was duly adjudged that at the time of the filing of the complaint therein there was no community property of the parties, which judgment is res adjudicata in this action; that plaintiff on January 7, 1950, demanded that defendant account for [***3] the former community property of the parties, at which time she was familiar with its character and value but that she failed to bring action until July 9, 1951, and that she thereby was guilty of laches; that on June 14, 1951, plaintiff commenced a municipal court action against defendant for $ 1,000 plus interest, allegedly due her under the property settlement agreement, and had attachment levied against his property and a keeper placed in charge of his business, which action and conduct constituted an election of remedies as to the property settlement agreement. The conclusions of law base the denial of relief to plaintiff on res adjudicata and election of remedies. Plaintiff appeals from the adverse judgment entered accordingly.

The decision of the question as to res adjudicata depends in this case on the merits, to wit, whether the findings of the trial court against fraud or concealment are supported by the evidence. **(1) (2)** Normally the determination in a divorce decree in accordance with the allegations of the complaint that there is no community property of the parties is conclusive on a defendant who defaulted after service of such complaint and summons and the subject cannot [***4] be relitigated (compare *Brown v. Brown, 170 Cal. 1 [147 P. 1168]*; *Lindley v. Hinch, 57 Cal.App.2d 717 [135 P.2d 421]*; *Maxwell v. Maxwell, 66 Cal.App.2d 549 [152 P.2d 530]*), but if the defendant [*834] was deprived of a fair opportunity fully to present his case because his adversary in violation of a confidential relationship had concealed from him facts essential to the protection of his rights, specifically when, as alleged in this case, community assets have been concealed by a husband from his wife in connection with the negotiating of a property settlement agreement, equitable relief from such a judgment may be

granted. ( *Jorgensen v. Jorgensen, 32 Cal.2d 13, 19* et seq. [*193 P.2d 728]*.) However, we need not go into said question involving the merits because the judgment must at any rate be sustained on another ground.

[**663] The trial court held that appellant was precluded from claiming that the agreement was void and found the circumstances on which to base this conclusion, to wit, the demand in January, 1950, and the institution of the action on the contract with attachment in June, 1951. The demand was contained in a letter [***5] of appellant to her former husband dated January 6, 1950, and received in evidence, which contained among other things the following language: "You did not do right by me and you was very selfish when it come to dividing the money and you know it. You know that home we sold in Oroville you got 9500.00 for it also you made a profit on the duplex on Brookdale. . . . But I am going to work and then I am going to get an attorney and see if I can do anything about it. I have all the papers here and I have my bank book that was dated a year before you divorced me. So I shall find out all about it then watch out. I am not asking for anything only what rightfully belongs to me because it is mine not all yours." This letter shows such knowledge of the possible defects of the agreement as to put appellant on inquiry and to require her to act diligently to protect her rights.

**(3)** *Section 1691, Civil Code*, requires the party who wishes to rescind an agreement to use reasonable diligence to rescind promptly when aware of his right and free from undue influence or disability. In such a suit acting promptly is a condition of his right to rescind ( *Victor Oil Co. v. Drum, 184 Cal. 226,* [***6] *243 [193 P. 243]*; *Neff v. Engler, 205 Cal. 484, 488 [271 P. 744]*) and therefore diligence must be shown by the actor whereas in other actions laches is an affirmative defense to be alleged by the defending party. **(4)** Absence of explanation of delay may even cause a complaint for

rescission to be demurrable. ( *Bancroft v. Woodward, 183 Cal. 99, 109 [190 P. 445].*) **(5)** A delay of more than one month in serving notice of rescission requires explanation. ( *Campbell* **[*835]** *v. Title Guarantee etc. Co., 121 Cal.App. 374, 377 [9 P.2d 264].*) **(6)** The diligence is required throughout and it applies as well to the time a person will be held aware of his right to rescind as to the time he will be held to have discovered the facts on which that right is based. ( *Bancroft v. Woodward, supra, 183 Cal. 99, 108*; *First Nat. Bank v. Thompson, 212 Cal. 388, 401 [298 P. 808].*) **(7)** "To bar an action for rescission on the ground of laches it is unnecessary to show that the defendants were prejudiced by the delay." ( *Fabian v. Alphonzo E. Bell Corp. 55 Cal.App.2d 413, 415 [130 P.2d 779].*) In this case the complaint dated and filed July 9, 1951, alleges that plaintiff **[***7]** disavows and rescinds the agreement "hereby" which causes the rescission to be nearly three years after the agreement and more than one and one-half years after she had shown by her letter to have been put on inquiry.

**(8)** Moreover the fact that on June 14, 1951, appellant commenced an action on the contract and levied an attachment is highly relevant. This fact in itself may show that appellant did not promptly institute an action for *rescission.* ( *Estrada v. Alvarez, 38 Cal.2d 386, 390 [240 P.2d 278].*) **(9)** As appellant had then for one and one-half years been put on inquiry it can also be considered as an election to affirm the contract and to waive the fraud. ( *Civ. Code, § 1588*; *Ruhl v. Mott, 120 Cal. 668, 677 [53 P. 304]*; *Montgomery v. McLaury, 143 Cal. 83, 88 [76 P. 964]*; *LeClercq v. Michael, 88 Cal.App.2d 700, 702 [199 P.2d 343].*) **(10)** The obtaining of an attachment in pursuance of the action on the contract to her own advantage and to the detriment of respondent may also have estopped her from pursuing an action for rescission ( *Steiner v. Rowley, 35 Cal.2d 713, 720 [221 P.2d 9]*; *Estrada v. Alvarez, supra, 38 Cal.2d 386, 391.*) **[***8]** Even if the defenses of affirmance, waiver and estoppel would not be available to respondent because he did not plead them, the question of unreasonable delay would remain decisive. **(11)** The question of laches or unreasonable delay must in each case be determined upon the basis of its facts, and in the absence of a palpable abuse of discretion the trial court's finding upon the issue will not be disturbed on appeal, both when he finds for or against laches. ( *Williams v. Marshall, 37 Cal.2d 445, 455 [235 P.2d 372]*; *Fabian v. Alphonzo E. Bell Corp., supra, 55 Cal.App.2d at p. 415.*) Accordingly in this case we are bound **[**664]** by the trial court's finding of laches because if appellant **[*836]** can be said to have made any showing of excuse of delay at all, said showing was certainly not such that it proves as a matter of law that she had not forfeited her right to attack the validity of the property settlement agreement.

Judgment affirmed.